|  |  |
|---|---|
| SIREEN SAWALHA HASHEM, | : |
| | : |
| Plaintiff, | : Civil Action No.: 15-8585 (FLW) |
| v. | : |
| | : **OPINION** |
| HUNTERDON CENTRAL REGIONAL HIGH | : |
| SCHOOL BOARD OF EDUCATION, *et. al.*, | : |
| | : |
| Defendants. | : |

**WOLFSON, United States District Judge**:

In this employment discrimination suit, Plaintiff Sireen Sawalha Hashem ("Plaintiff" or "Ms. Hashem"), an Arab Muslim woman of Palestinian descent, alleges that her former employers, Hunterdon Central Regional High School ("Hunterdon Central") and Hunterdon Central Regional High School Board of Education (the "Board"), as well as her former supervisors, Christina Steffner, Suzanne Cooley, and Rebecca Lucas (the Board, Steffner, Cooley, and Lucas, cumulatively referred to as "Defendants"), discriminated and retaliated against Plaintiff on the basis of her race, religion, and national origin, in violation of Title VII of the Civil Rights Act of 1963, 42 U.S.C. § 2000e, *et seq*. ("Title VI") and the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-3, *et seq*. ("NJLAD"). Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED** in its entirety.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following facts are undisputed unless otherwise noted. Plaintiff was born in Kafir Rai, and she identifies as an Arab Muslim woman. Defendants' Statement of Material Facts ("Defs.' Facts"), ¶¶ 1, 2. Plaintiff was initially employed as a Student Teacher at Hunterdon Central from

January 2013 through May 2013, until she was offered and accepted a full-time position as a U.S. History teacher in the Social Studies Department, which position commenced in September 2013. *Id.* at ¶¶ 3-4. Robert Zywicki ("Mr. Zywicki"), who was the supervisor of social studies, originally served as Plaintiff's immediate supervisor for a period of approximately three months, until he left Hunterdon Central in November 2013. *Id.* at ¶ 5.

On October 13, 2013, Plaintiff incorporated a video into her U.S. History lesson plan pertaining to Malala Yousafzai (the "Malala Video"),[1] which was previously used by Lindsay Warren ("Ms. Warren"), another teacher at Hunterdon Central. *Id.* at ¶ 7. Subsequently, an unidentified parent complained about a comment that Plaintiff allegedly made during a class discussion which followed the Malala Video, *i.e.*, the manner in which a woman dresses is a method of rape prevention.[2] *Id.* at ¶ 8.

Mr. Zywicki had a conversation with Plaintiff to address the parent's complaint, but the parties dispute the events which then occurred. *Id.* at ¶ 9. According to Defendants, Mr. Zywicki informed Plaintiff, in a written communication, that he had accepted her representation that the parent's complaint was inaccurate, and he advised her to "simply be aware of the different messages that students might take away from current event conversations." *Id.* at ¶¶ 9-10. However, in addition to these written statements, Plaintiff maintains that Mr. Zywicki "simultaneously told" her that she "wasn't Lindsay," and he forbade her from referencing the "Near East" or "Islam." Pl.'s Counterstatement of Material Facts ("Pl.'s Facts"), ¶ 10. Nonetheless,

---

[1]     In the Third Amended Complaint, Plaintiff describes Malala Yousafzai as a "young girl who survived being shot in the head by the Taliban because she advocated education for girls." Third Amended Complaint ("TAC"), ¶ 16.

[2]     Plaintiff does not affirmatively deny this fact, but rather contends that there is no admissible evidence to support this allegation. Plaintiff's Counterstatement of Facts ("Pl.'s Counterstatement"), ¶ 8.

Plaintiff admits she was subsequently invited by the school to share her personal story with a class of students, and she assisted in separate lessons that pertained to the history and politics of Kafir Rai and Islam. Defs. Facts, ¶ 11.

On February 2, 2014, defendant Rebecca Lucas ("Ms. Lucas") replaced Dr. Zywicki as the supervisor of social studies for Hunterdon Central. *Id*. at ¶ 13. In March 2014, a parent complained to "non-Arab, non-Muslim, non-Palestinian teachers" about the use of the novel "The Lemon Tree," in a classroom where Plaintiff served as a translator during a webcam session with the book's protagonist. *Id*. at ¶¶ 14, 16. Plaintiff does not dispute that the parent's complaint was in writing, and it neither referenced Plaintiff nor the translation services which she provided. *Id*. at ¶ 15. Rather, Plaintiff maintains that she never read the parent's written complaint. Pl's. Facts, ¶ 15.

In May 2014, an incident occurred where Plaintiff's students apparently misunderstood her lesson about the actions of John Brown at Harper's Ferry, prompting a debate about whether Osama bin Laden was a terrorist; Plaintiff, in no way, intended to suggest Osama bin Laden was not a terrorist. *Id*. at ¶ 17. Plaintiff's contract was renewed for the following 2014/2015 school year, and she was assigned to teach U.S. History and Global Studies. *Id*. at ¶ 20. Plaintiff does not dispute the renewal of her contract, but she clarifies that she was "offered a position" for the new school year prior to the "John Brown/Osama bin Laden" incident. Pl's. Facts, at ¶ 20.

The parties dispute the events which occurred on September 8, 2014, during the first week of Plaintiff's second year of teaching. According to Defendants, some of Plaintiff's Jewish students construed Plaintiff's comments, during a class, as having asked them to identify their religious affiliations. Defs. Facts, at ¶ 21. Although Plaintiff denies this fact, she admits that a parent whose child was allegedly questioned subsequently wrote a complaint, in which the parent expressed her disapproval and notified the school that her daughter's civil rights had been violated. *Id*. at ¶ 22.

Other parents whose children were allegedly questioned requested to have their children removed from Plaintiff's classroom. *Id*. at ¶ 24.

On September 8, 2014, in a Facebook post, a student alleged that Plaintiff's brother was a terrorist. *Id*. at ¶ 25. Plaintiff's mentor re-published the Facebook post to a classroom which was taught by two of his colleagues, after which all three individuals were reprimanded for such actions. *Id*. at ¶¶ 28-29. The Facebook post, as well as the aforementioned parent's written complaint, were addressed by the school during two meetings with Plaintiff on September 9, 2014, one of which was recorded, and during a third recorded meeting on September 11, 2014. *Id*. at ¶ 30.

Plaintiff was called over the telephone to attend the recorded meeting on September 9, 2014, which took place in Defendant Cooley's office.[3] *Id*. at ¶ 31. During the meeting, the following information was relayed to Plaintiff: a "call had been made [to the District's attorney] to find out what could be done about the Facebook post"; "we do not condone this behavior"; and "we will do what we can in terms of what the attorney says we can do." *Id*. at ¶¶ 32-33. Plaintiff was also provided with an opportunity to explain the lesson which prompted some students to believe that they had been asked to identify their religious affiliations. *Id*. at ¶ 34. Defendants explain that, at no point during this meeting was Plaintiff accused of discriminating against Jewish children, nor did they suggest that Plaintiff intended to "single [Jewish children] out by religion."

---

[3]    Although Plaintiff disputes this fact and contends that she "was [instead] summoned via intercom[,] and the entire school knew it," Defs. Facts, ¶ 31, the Court need not accept her factual allegations. Indeed, during her deposition, Plaintiff conceded that she was called over the telephone to Defendant Cooley's office. *See*, *Blaylock v. City of Philadelphia*, 504 F.3d 405, 414 (3d. Cir. 2007) ("[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986)).

*Id.* at ¶¶ 36-37. However, Plaintiff maintains that "a reasonable person in her circumstances could feel and believe that" various unspecified "portions of the conversation were accusatory." Pl.'s Facts, ¶ 36.

During the meeting on September 11, 2014, Plaintiff was again informed that the student's Facebook post was "unacceptable," and that the student's mother "was horrified and conveyed her apologies." Defs.' Facts, ¶ 38. In addition, while Defendants stated that they could not punish the student, because his Facebook post was allegedly protected by the First Amendment, Plaintiff was advised, on multiple occasions, that she could contact her union in order to determine if she had a private cause of action. *Id.* at ¶¶ 39-40. The parties dispute the manner in which the remainder of the meeting was conducted. According to Defendants, although Plaintiff's brother was discussed, it was only within the context of the student's Facebook post, and Plaintiff was never questioned about him; rather, Plaintiff voluntarily shared information about him. *Id.* at ¶¶ 41-42. However, Plaintiff avers that there was a "lengthy colloquy" about Plaintiff's brother, during which "Defendants fully engaged in that process and asked her questions." Pl.'s Facts, ¶¶ 41-42.

Furthermore, in the beginning of the 2014/2015 school year, Plaintiff engaged in a lengthy email exchange with a student's parent, lasting for a period of more than several months. Defs.' Facts, at ¶ 44. Plaintiff subsequently wrote to her mentor, Mr. DeTample, and stated that "I cannot deal with this mom. I'm not going to reply to her at all." *Id.* Defendants also chronicle an incident wherein Plaintiff allegedly used a paper which the student wrote as an exemplar in a class, in order to embarrass that student. Plaintiff explains that the supervisor of the English Department recommended that she provide examples of "A," "B," and "C" papers to her students for educational purposes. *Id.* at ¶ 44; Pl.'s Facts, ¶ 44.

The parties also dispute an incident which allegedly occurred during an unspecified time of Plaintiff's second year of teaching. According to Defendants, Plaintiff mistreated a student with accommodations mandated by Section 504 of the Americans with Disabilities Act (the "Section 504 student"), after which her mother requested to have her removed from Plaintiff's classroom. *Id*. at ¶¶ 48-49. Conversely, Plaintiff disputes that she mistreated the Section 504 student, and, according to Plaintiff, the guidance counselor actually suggested to remove the Section 504 student from her classroom, and that the Section 504 student's mother merely concurred with that recommendation. Pl.'s Facts, ¶ 49.

On April 14, 2015, Plaintiff received an email from Defendant Lucas, informing her of a meeting scheduled for April 16, 2015, and her right to be represented by a member of the union. Defs.' Facts, ¶¶ 56-57. Plaintiff attended the meeting with Adam Leonard, a colleague and union representative, during which Defendant Lucas informed Plaintiff that her contract for the following school year would not be renewed. *Id*. at ¶ 59. During the relevant timeframe, three other non-tenured social studies teachers, like Plaintiff, did not have their contracts renewed—they were all "Caucasian, non-Arab, non-Muslim and non-Palestinian." *Id*. at ¶ 52. Moreover, two of the non-tenured social studies teachers were male, while the remaining one was female. *Id*. at ¶¶ 53-54.

On April 21, 2015, Defendant Steffner provided Plaintiff with written notice of the non-renewal. *Id*. at ¶ 60. On May 18, 2015, Plaintiff received a second notice, wherein Defendant Steffner stated the reasons for non-renewal, and she advised Plaintiff of her right to request that the Board review the decision. *Id*. at ¶ 61.

On June 15, 2015, Plaintiff appeared at a hearing before the Board in order to overturn the non-renewal of her contract. *Id*. at ¶ 62. On the advice of her union representative, Plaintiff chose to have the hearing conducted in a private executive session, which was only attended by the

following parties: Board members and counsel, Plaintiff and her union representative, and Defendant Steffner. *Id*. at ¶¶ 63-65. On June 17, 2015, Defendant Steffner provided Plaintiff with written notice, which stated that "the Board did not vote to overrule the recommendation that your employment contract be non-renewed for the 2015-2016 school year," and that her employment would end on June 30, 2015. *Id*. at ¶ 66.

On the last day of the 2014/2015 school year, the Section 504 student published an email post, wherein she complained that she and her mother were being blamed for the non-renewal of Plaintiff's contract. *Id*. at ¶ 67. A substitute teacher was subsequently assigned to Plaintiff's classroom for the remainder of the school day. *Id*. at ¶ 67. On July 16, 2015, two FBI agents visited Plaintiff at her home, because they received information which indicated that, while Plaintiff was at the private executive session held before the Board, she allegedly stated that "they [members of the Board] will be sorry if I am fired." *Id*. at ¶ 69. Plaintiff denies having made such a statement. Pl.'s Facts, ¶ 69.

On December 14, 2015, Plaintiff filed the instant action. In her Third Amended Complaint, Plaintiff asserts the following five causes of action against Defendants: (Count I) employment discrimination on the basis of race, national origin, and religion in violation of Title VII and NJLAD; (Count II) disparate treatment in violation of Title VII and NJLAD; (Count III) retaliation in violation of Title VII and NJLAD; (Count IV) discriminatory discharge in violation of Title VII and NJLAD; and (Count V) violation of the Fourteenth Amendment and the New Jersey Constitution. TAC, ¶ 52-76.

In the instant matter, Defendants move for summary judgment, arguing that Plaintiff has failed to produce any admissible evidence which supports her causes of action against Defendants. In addition, Defendants contend that their decision not to renew Plaintiff's contract was based on

legitimate, non-discriminatory reasons. In Plaintiff's six-page opposition brief, Plaintiff does not address Defendant's argument concerning the sufficiency of Plaintiff's evidence to prove her *prima facie* case as to all the claims, but rather merely maintains that the proffered reasons for the non-renewal of her contract are pretextual. Plaintiff also submits her own sworn certification, and certifications from Derek Khoudja and Darrell DeTample, both of whom are Plaintiff's former colleagues.

## II.  STANDARD OF REVIEW

Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the

burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id*. at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*. Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III.    ANALYSIS

Defendants move for summary judgment on Plaintiff's Title VII and NJLAD claims, arguing that Plaintiff has failed to provide any evidence to establish a *prima facia* case of discrimination. Defendants' Motion for Summary Judgment ("Defs.' Motion"), at 4-11. Defendants alternatively argue that, even if Plaintiff has satisfied her evidentiary burden on this motion, their decision not to renew her contract was motivated by legitimate, non-discriminatory reasons. *Id.*, at 12-21. Plaintiff does not respond to Defendants' initial argument in her sparse opposition brief, but rather only addresses the reasons which are provided in support of the decision of non-renewal.

### A.    McDonnell Douglas

Discrimination claims brought under Title VII and the NJLAD are analyzed according to the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). *Davis v. City of Newark*, 285 Fed. Appx. 899, 903 (3d Cir. 2010); *see Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999) ("Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim"); *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 194 (1999) (citations omitted) (finding that a claim of employment discrimination under Title VII, Section 1981 or NJLAD be analyzed under the same standard).

To establish a *prima facie* case of discrimination, the plaintiff must prove that (1) she belongs to a protected class; (2) that she was qualified for the position; (3) that she suffered an adverse employment action; (4) and the adverse action occurred under circumstances that give rise to an inference of discrimination. *Davis*, 285 Fed. Appx. at 903; *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-12 (3d Cir. 1999); *see Burdine*, 450 U.S. at 253-54 & n.6, *McDonnell Douglas*,

411 U.S. at 802. An adverse employment action must be "sufficiently severe as to alter the employee's 'compensation, terms, conditions, or privileges of employment,' or to 'deprive or tend to deprive [him or her] of employment opportunities or otherwise adversely affect his [or her] status as an employee.'" *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296-97 (3d Cir. 1997), abrogated on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (quoting 42 U.S.C. § 2000e-2(a)(1) and (2)). Not every "insult, slight, or unpleasantness gives rise to a valid Title VII claim." *Id*. at 1297.

As to the fourth factor, an inference of discrimination could be supported in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by supervisors suggesting racial animus. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002); *Golod v. Bank of Am. Corp.*, 403 Fed. Appx. 699, 703 n.2 (3d Cir. 2010). In other words, the manner in which a plaintiff can support an inference of discrimination is flexible, as "[t]here is no exclusive method of establishing causation and the evidence as a whole may suffice to raise the inference." *Wesley v. Palace Rehab. & Care Ctr., L.L.C.*, 3 F. Supp. 3d 221, 232 (D.N.J. 2014) (citing *Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997)); *Cheatom v. Burger King Corp.*, No. 05-251, 2006 U.S. Dist. LEXIS 6670, at *11 (E.D. Pa. Feb. 22, 2006) ("The requirement that the adverse employment action occur under circumstances giving rise to an inference of discrimination . . . must be tailored to fit the context of [a particular] case.") (citations omitted).

### B. Employment Discrimination

In the instant matter, Plaintiff submits certifications from herself and two of her former colleagues, Darrell DeTample and Derek Khoudja, in order to demonstrate that she was allegedly discriminated against on the basis of race or religion. However, as a threshold matter, the Court

will not consider the Khoudja Certification in determining whether Plaintiff has satisfied her evidentiary burden on this motion, because that document does not bear his signature. Indeed, as Mr. Khoudja's testimony was neither made under under oath nor under the penalty of perjury, it is stricken from the record.[4] *United States v. Branella*, 972 F. Supp. 294, 300 (D.N.J. 1997) ("The failure to acknowledge the penalty of perjury prevents the court from considering the affidavits' contents for purposes of summary judgment."); *see also Tukesbrey v. Midwest Transit, Inc.*, 822 F. Supp. 1192, 1198 (D.N.J. 1993) ("Matters which are not sworn or certified should be stricken.") (citations omitted).

In her own certification, Plaintiff references various events which purportedly occurred during the course of her employment at Hunterdon Central. More specifically, she states that in March 2014, a parent complained about "The Lemon Tree," a book which was used in a class where she served as a translator for its main character during a webcam session. Plaintiff's Certification Opposing Summary Judgment, ("Pl's. Cert.") (dated October 2018), ¶ 4. Subsequently, in May 2014, according to Plaintiff, a parent complained about a comment which she purportedly made during a class discussion about John Brown at Harper's Ferry. Plaintiff, then, met with defendant Cooley, who allegedly requested that she avoid teaching subjects about "Islam, terrorism, or the Middle East," regardless of whether those topics related to her history class. *Id.* at ¶¶ 5-6. Plaintiff references another occasion when a parent complained, because Plaintiff allegedly asked Jewish students to identify their religious affiliation, during a class on September 8, 2014. On that same day, Plaintiff maintains that a student published a Facebook post wherein her brother was accused of being a terrorist. On the following day, Plaintiff claims that

---

[4]    The Court notes that Plaintiff never cured this defect by providing a signed certification from Mr. Khoudja.

she was called into a meeting to address these matters over "the school loudspeaker," notwithstanding the fact that teachers are normally "contacted via their classroom telephones." *Id.* at ¶¶ 9, 10.

In DeTample's Certification, he states that he attended the meeting in which defendant Cooley allegedly instructed Plaintiff to avoid subjects in connection with "Islam, terrorism, or the Middle East," regardless of whether those topics pertained to her history class. Darrell DeTample Certification Opposing Summary Judgment, ("DeTample Cert.") (dated October 2018). According to Mr. DeTample, Ms. Cooley also explained that "a gay teacher teaching about gay rights or issues would likely not be perceived as unbiased by her students and that Ms. Hashem was the same." *Id.* at ¶ 3. After the meeting concluded, Mr. DeTample avers that he had a brief discussion with defendant Lucas, during which defendant Lucas allegedly stated as follows: "Ms. Cooley's instructions to Ms. Hashem were wrong, and [they] reflected community bias against Ms. Hashem." *Id.* at ¶ 4.

As a preliminary matter, Plaintiff's certification with respect to the manner in which she was called to the meeting on September 9, 2014 is inconsistent with her prior deposition testimony. More specifically, in her certification, Plaintiff recalls feeling "embarrass[ed]" when she was allegedly called into the meeting over the loudspeaker, because teachers are "normally contacted via their classroom telephones." Pl's. Cert., ¶ 9. However, during her deposition, Plaintiff expressly stated otherwise:

> Q:  [Referencing the meeting on September 9, 2014] Wait. Wait. Stop. I want to ask you because I think this is very, very important. Are you telling me there's an intercom system in that school where you are called to the office over a speaker, rather than a telephone?
>
> A:  I was just going to correct.
>
> Q:  Okay.

13

> A:     They called me in my lunchroom. They called many places looking for me and they found me in the teacher room.
>
> Q:     By phone, they called you by phone, right?
>
> A:     Yes.

Tr. dated July 14, 2015, T165:16-T166:4. Plaintiff cannot, now, alter her own deposition testimony through the submission of a certification in opposition to summary judgment. Therefore, the Court will disregard the portion of her Certification which relates to the manner in which she was called to the meeting on September 9, 2014. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that, on a motion for summary judgment, a court should not accept facts "blatantly contradicted by the record"); *Nappi v. Holland Christian Home Ass'n*, No. 11-2832, 2015 U.S. Dist. LEXIS 112537, at *16 n.6 (D.N.J. Aug. 21, 2015) (disregarding a portion of the plaintiff's certification in support of his Title VII and NJLAD claims, "to the extent it contradicts his prior [deposition] testimony."). Indeed, the record demonstrates that she was contacted over the telephone, as she, herself, concedes is no different from the normal procedure used in Hunterdon Central.

Mr. DeTample's certification also raises various issues which must be addressed first, particularly since it references multiple hearsay statements from defendants Cooley and Lucas. Indeed, defendants argue that the Court should refrain from considering the certification on this basis. While Plaintiff, herself, has failed to address Defendants' argument with respect to the issue of hearsay, Third Circuit has held that, on a motion for summary judgment, an opposing party may only rely upon a hearsay statement if that statement would be admissible at trial. *Smith v. City of Allentow*n, 589 F.3d 684, 693 (3d Cir. 2009); *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 at n.2 (3d Cir. 2000) ("In this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial."). Therefore, because the disputed certification references statements which were allegedly made by defendants Cooley and

Lucas, both of whom are defendants in this action, they can fall within the opposing party statement exception to the hearsay rule, as defined under Federal Rule of Evidence 801(d)(2). *See* Rule 801(d)(2)(A) (excluding from the definition of hearsay a "statement . . . offered against an opposing party" that "was made by the party in an individual or representative capacity[.]").

Defendants also argue that the Court should disregard the DeTample Certification, because the alleged statements which are attributed to defendants Cooley and Lucas are contradicted by the record. In that regard, Defendants underscore that Plaintiff did, in fact, participate in multiple classes which discussed topics which she was allegedly precluded from teaching. As Defendants contend, Plaintiff was even "assigned to teach global studies," and, during her second year, she "taught about the Black Death" and how various religions, "including Islam[,] responded differently to the disaster." Defendant's Reply in Further Support of Summary Judgment, ("Defs.' Reply"), at 5. Citing their own deposition testimony, Defendants additionally maintain that they were unaware of a community bias towards Plaintiff, or a community effort to prevent the renewal of her 2015/2016 contract.[5] However, the Court cannot reject Mr. DeTample's Certification on this basis, as such a ruling would constitute impermissible fact finding. Indeed, although the weight of the record ultimately weighs against the DeTample Certification, issues of credibility fall within the province of the jury, not this Court. *See Doe v. Luzerne Count.*, 660 F.3d 169, 175 (3d Cir. 2011) (During the summary judgment stage of litigation, "[t]he court may not . . . weigh the

---

[5]    *See, e.g.,* Lucas Dep., T39:11-17 ("Q. Did you ever become aware of any community effort or interest in seeing that Ms. Hashem was not renewed as a teacher?; A. No.); Cooley Dep., T67:16-19 ("Q. During the 2014-2015 school year, did you become aware of any community effort to have Ms. Hashem removed as a teacher?; A. No."); Steffner Dep., T76:23- 77:17. ("Q. Okay. At any time in the 2014/2015 school year, did you become aware of any community effort to have plaintiff not renewed as a teacher for the next school year?; A. Absolutely not.").

evidence or make credibility determinations because these tasks are left for fact finder.") (internal citation and quotations omitted). I, now, turn to the facts.

I note that the sufficiency of Plaintiff's evidence with respect to the first three factors for establishing a *prima facie* case is not in dispute: (1) Plaintiff is a member of a protected class (Arab Muslim woman of Palestinian descent); (2) Plaintiff was qualified as a teacher; and (3) Plaintiff suffered an adverse employment action because her contract was not renewed for the 2015/2016 school year. Rather, Defendants challenge whether Plaintiff has sufficiently established the last factor of her *prima facie* case—an inference of racial discrimination. More specifically, Defendants argue that Plaintiff has failed to produce any direct or indirect evidence to establish an inference of discrimination. Defs.' Brief, at 2-11. Indeed, Defendants contend that Plaintiff has either abandoned or failed to support the allegations as originally pled in her amended Complaint, and that she has not produced any admissible evidence which demonstrates that Defendants, themselves, acted with a racial or religious animus towards Plaintiff during the course of her employment. The Court agrees.

Plaintiff has not proffered any direct admissible evidence to support that Defendants made discriminatory or disparaging remarks to Plaintiff, on the basis of her race, religion, or national origin. Although Plaintiff references transcripts from various meetings between the school and Plaintiff to purportedly support the fact the Defendants acted with discriminatory animus, to the contrary, these transcripts clearly show that Defendants harbored no such animus. For example, a meeting was held on September 11, 2014, after a student claimed that Plaintiff's brother was a terrorist on Facebook. In that meeting, Defendants expressed sympathy towards Plaintiff, were apologetic, and even encouraged Plaintiff to contact her union representative, in order to determine if she could bring a private cause of action against the student:

| | |
|---|---|
| Female: | Before we get started (inaudible) let me tell you that (inaudible) the parents of the boy that [published the Facebook post] |
| Hashem: | Okay. |
| Female: | And I feel bad because -- Sireen you got hit with that right before we had a meeting -- |
| Hashem: | Right. |
| Female: | -- and it really -- |
| Hashem: | Yeah. |
| Female: | -- I think put you in a position where it was hard for you to focus on what we were all doing. So, let me just say, from the get go, that that behavior, and what [the student] posted, was unacceptable. And . . . as soon as I found out about it, I immediately called our attorney to find out what we could and couldn't do. Our attorney advised me. I took action within probably an hour or so, it was taken down. |
| Hashem: | Oh. |
| Female: | I met with those students and his – that student and his parents last night. I will tell you that his mother is extremely disturbed by the post . . . and feels very bad about it. . . . So, she did want me to say to you that she is very sorry for his actions. So the post is down. . . . Our attorney has been pretty clear that we can't go after him. But I'm sure NJEA will tell you that, you know, you might have legal recourse. And that's up to you. |
| | . . . . |
| Female: | I know he feels bad about the way he worded [the Facebook post] and what he said. And I don't want you, Sireen to feel that you're not supported. If you weren't supported, and – you know, we would have just – if we thought that you, you know, were guilty of something that was inappropriate or – at that point, we would have you suspended. We would have, you know, taken action. As soon as we heard about this post, we knew it was inappropriate and did what we needed to do to try and get it removed. |

. . . .

Female: So, you know, I – again, I apologize. Actually, his mother wanted you to know – wanted me to tell you how bad she felt that – if it created any hurt for you, that . . . she, as a mother, as a woman, she was very upset that her son would [d]o something that would cause pain to someone else.

Hashem: Thank you.

Defs.' Brief, Exhibit F, 8-10, 19, 22.

Although Plaintiff, nonetheless, claims that she personally felt attacked by the school during meetings with Defendants, it is well established that Plaintiff's "own subjective impression" in connection with Defendants' alleged antagonism towards her race or religion is insufficient to sustain a claim under Title VII and NJLAD. *See e.g., Groeber v. Friedman & Schuman, P.C.*, 555 Fed. Appx. 133, 135 (3d Cir. 2014) (A plaintiff's "subjective belief that race played a role in [that plaintiff's] employment decisions . . . is not sufficient to establish an inference of discrimination[.]"); *Tucker v. Thomas Jefferson Univ.*, 484 Fed. Appx. 710, 712 (3d Cir. 2012) ("the subjective belief that race played a part in his firing is insufficient."); *McDonnaugh v. Teva Specialty Pharms.*, No. 09-5566, LLC, 2011 U.S. Dist. LEXIS 98638, at *16-17 (E.D. Pa. Aug. 31, 2011) (finding that the plaintiff's "subjective belief that race played a role in an employment decision is insufficient to establish an inference of discrimination.") (citation omitted). Indeed, time and time again, the transcripts do not reveal any remarks and comments made by the school administration that can be construed as discriminatory. Accordingly, the Court finds that Plaintiff has not provided, nor does the record as a whole show, any direct evidence of discrimination.

Next, Plaintiff submits a certification from Mr. DeTample which references an alleged "community bias" against Plaintiff, presumably to show that a bias on the basis of Plaintiff's race or religion existed. In her own certification, Plaintiff discusses various incidents which occurred

over the course of the 2014/2015 school year, which she claims show that she was constantly met with discrimination from the school's community.

Plaintiff references a parent's complaint from March 2014, about "The Lemon Tree," a book which was used in another teacher's class, and Plaintiff provided translation services for its main character who appeared during a webcam session. However, that parent submitted the complaint to various, unidentified teachers in Hunterdon Central—not the school's administration. There is no evidence that Defendants were aware of this particular complaint. And, more importantly, Plaintiff does not dispute that the complaint makes no reference to Plaintiff or the translation services which she provided. Rather, it simply took issue with the use of the book, itself, and the inclusion of that novel in the school's curriculum. With nothing more, Plaintiff has not shown that the parent's complaint—which does even refer to Plaintiff—constitutes an example of community bias towards Plaintiff.

Plaintiff also references a parent's complaint from May 2014, in connection with a class discussion which was ultimately misunderstood by her students, resulting in a debate about whether Osama bin Laden was a terrorist. But, Plaintiff does not dispute that the parent's complaint was not motivated by Plaintiff's race or religion, and that the complaint did not make any discriminatory or disparaging remarks about Plaintiff. Rather, the complaint took issue with a specific remark which Plaintiff made during a class debate, as Plaintiff having expressed her opinion said that Osama bin Laden was not a terrorist. Indeed, Plaintiff, herself, concedes that her intended message was misinterpreted by her students. This incident, too, does not show any racial bias against Plaintiff.

Lastly, Plaintiff references another complaint from a parent made in September 2014, which was lodged because Plaintiff allegedly asked a student to identify her religious affiliation

during a classroom discussion. Upon closer inspection, the complaint deals with the specific interaction between Plaintiff and that student. More specifically, the parent was concerned that her child was "pressured" into disclosing her religious beliefs in a public school. While the complaint dealt with religion, the complaint clearly did not include Plaintiff's own religious belief, but rather that of the student. Accordingly, when viewing the complaints as a whole, the Court finds that they do not show any inference of discrimination.

Moreover, the DeTample Certification does not help Plaintiff's case. DeTample attests that defendant Cooley directed Plaintiff to avoid teaching subjects based on Islam, terrorism, or the Middle East, which defendant Lucas acknowledged when he stated to DeTample that Cooley's directions "reflected community bias" towards Plaintiff's race or religion. *See* DeTample Cert, ¶ 4. Even if this Court were to assume that every incident which the parents described in their complaints are pretextual, and that the actual reason for their complaints arose from a religious or racial animus towards Plaintiff, these circumstances, at most, would merely demonstrate that the discrimination emanated from the school's community—not the school itself.

Plaintiff has not identified any caselaw or authority for the legal proposition that the school may be liable for the alleged prejudicial acts of the community, based on some theory of discriminatory acquiescence. Stated differently, Plaintiff has not demonstrated that the community's alleged animus towards Plaintiff may be imputed to the school, or that the school violated her constitutional rights by allegedly acquiescing or succumbing to the parents' hostility towards Plaintiff, when they refused to renew Plaintiff's contract for the 2015/2016 school year. Viewing the evidence in the light most favorable to the Plaintiff, and providing her with every

reasonable inference, Plaintiff has not asserted a viable theory of discrimination to satisfy the element of discriminatory intent. Accordingly, she has not shown a *prima facie* case.[6]

While the Court would normally engage in a burden shifting analysis under *McDonnell Douglas*, such an inquiry is not required here, as Plaintiff has failed to establish a *prima facie* case of discrimination.[7] *Sosa v. Napolitano*, 318 Fed. Appx. 68, 72 (3d Cir. 2009) ("We need not [engage in] "the burden shifting framework of *McDonnell Douglas* . . ., because [the plaintiff] has failed to establish the *prima facie* case of discrimination required . . . and has failed to produce sufficient direct or circumstantial evidence to raise a genuine issue of material fact regarding whether her termination was motivated by" race or national origin). Accordingly, Defendants are entitled to summary judgment on Plaintiff's employment discrimination claim under Title VII and NJLAD. Because Plaintiff's claim of discriminatory discharge under Title VII and NJLAD is duplicative of her employment discrimination claim, an entry of summary judgment as to that cause of action is also appropriate.

### C.    Disparate Treatment

Defendants also move for summary judgment on Plaintiff's claim for disparate treatment under Title VII and NJLAD. Under Title VII and NJLAD, "[a] disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated

---

[6]    The Court notes that Plaintiff also received additional complaints that are unrelated to any mentioning of race or religion: a parent complained regarding an alleged in-class mistreatment of a Section 504 student by Plaintiff.  Additionally, another parent accused Plaintiff of shaming her child by using that child's assignment as an exemplar in class.  I mention these complaints to show that there were other instances where Plaintiff was criticized for her teaching style, rather than touching upon non-secular subjects.

[7]    Although I do not address the burden shifting analysis in full, even if I were to consider Defendants' legitimate reasons for not renewing Plaintiff's contract, I would find that Plaintiff has not satisfied her burden of demonstrating pretext, for similar reasons why Plaintiff is unable to carry her burden of proving Defendants' discriminatory intent.

less favorably than others similarly situated on the basis of an impermissible criterion under Title VII." *EEOC v. Metal Service Co.*, 892 F.2d 341, 347 (3d Cir. 1990). Importantly, a plaintiff must demonstrate that the employer acted with a discriminatory intent, which can either be shown through direct evidence or indirect or circumstantial evidence. *Id.* Stated differently, the plaintiff must produce evidence that "create[s] an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Id.* at 348 (internal quotation marks and citation omitted); *see Crawford v. Verizon Pa., Inc.*, 103 F. Supp. 3d 597, 606 (E.D. Pa. 2015). However, the Third Circuit noted that "courts must be sensitive to the myriad of ways such an inference can be created.' *Metal Service Co.*, 892 F.2d at 347.

Here, Plaintiff has failed to establish a *prima facie* case in support of her disparate treatment claim, as she has produced no evidence to show she was singled out and treated less favorably than other similarly situated individuals. In her amended pleading, Plaintiff originally alleged that, during a meeting on September 11, 2014, defendant Steffner reprimanded Plaintiff for showing the Malala Video. When Plaintiff allegedly stated that Ms. Warren, a non-Arab, non-Palestinian, and non-Muslim teacher at Hunterdon Central also used the Malala Video, defendant Steffner "slammed her hand on the table in [a] menacing fashion and said you are not Lindsay." TAC, ¶ 28. However, Defendants have submitted a transcript of the meeting which clearly demonstrates that no such interaction between defendant Steffner and Plaintiff occurred. *See* Exhibit F.

In turn, Plaintiff shifts her position on this motion, and now states that Mr. Zywicki was the individual who purportedly said "she wasn't Lindsay," prior to his departure from Hunterdon Central in 2013. Pl's. Facts, ¶ 10. While Plaintiff cannot alter the version of events which Defendants have disproven in order to defeat summary judgment, her disparate treatment claim must, nevertheless, fail, because she has not provided any admissible evidence to support that Mr.

Zywicki allegedly made such a remark. Rather, Plaintiff includes this unsupported statement in her material statement of facts. *Trivedi v. Slawecki*, 642 Fed. Appx. 163, 168 (3d Cir. 2016) ("At summary judgment, a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial.").

Nonetheless, even if Mr. Zywicki, who is not named as a defendant in this action, allegedly made such a remark in 2013, Plaintiff's teaching contract was subsequently renewed for the 2014/2015 school year. Thus, Plaintiff has failed to show an inference of discrimination, such that she was disparately treated by Defendants based on her race, religion and national origin. Indeed, Plaintiff admits that, during the relevant timeframe, three other non-tenured social studies teachers, like Plaintiff, did not have their contracts renewed, all of whom were "Caucasian, non-Arab, non-Muslim and non-Palestinian." Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim of disparate treatment.

### D.     Retaliation

Defendants, too, move for summary judgment on Plaintiff's claim of retaliation under Title VII and NJLAD. To sustain a claim of retaliation under Title VII and NJLAD, a plaintiff must show that: "(1) she engaged in a protected activity under Title VII [and NJLAD]; (2) the employer took an adverse action against her; and (3) there was a causal connection between the employee's participation in the protected activity and the adverse employment action." *Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315, 320 (3d Cir. 2008); s*ee Hoist v. New Jersey*, No. 12-5370, 2015 U.S. Dist. LEXIS 106527, at *57 (D.N.J. Aug. 13, 2015); *see also Hargrave v. Cnty. of Atlantic*, 262 F. Supp. 2d 393, 423 (D.N.J. 2003) (stating that Title VII and NJLAD apply the same standard for retaliation). Importantly, the first element of Title VII only protects "those who oppose discrimination made unlawful by Title VII." *Moore v. City of Philadelphia*, 461 F.3d

331, 341 (3d Cir. 2006). "[O]nly complaints about discrimination prohibited by Title VII - that is, discrimination on the basis of race, color, religion, sex, or national origin, 42 U.S.C. § 2000e-2 constitute 'protected activity.'" *Davis v. City of Newark*, 417 Fed. App'x. 201, 203 (3d Cir. 2011); *see Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006).

Here, Plaintiff has failed to provide any evidence to support that she engaged in a protected activity under Title VII and NJLAD. As stated, Plaintiff originally pled that she engaged in a protected activity during a meeting with defendant Steffner, wherein she complained that she was being treated differently than Ms. Warren, who was allegedly permitted to use the Malala Video. Although Plaintiff maintained that, in turn, she was reprimanded by defendant Steffner and her employment contract was not renewed, the meetings' transcript demonstrates that no such interaction between them occurred. To be clear, Plaintiff has not addressed or produced sufficient evidence to support that she engaged in another form of a protected activity. Therefore, Defendants are entitled to summary judgment on Plaintiff's claim of retaliation under Title VII and NJLAD.

### E. Equal Protection

Finally, Defendants move for summary judgment on Plaintiff's claim under the Fourteenth Amendment's Equal Protection Clause. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (internal quotations and citation omitted); *see Artway v. Attorney Gen. of New Jersey*, 81 F.3d 1235, 1267 (3d Cir. 1996) (stating that the Equal Protection Clause of the

Fourteenth Amendment exists to protect similarly situated individuals from disparate treatment under the law or by some other state action). In order to bring a successful claim for a denial of equal protection, a plaintiff must show the existence of purposeful discrimination because he or she is a member of a protected class, and that he or she "received different treatment from that received by other individuals similarly situated." *Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009) (internal quotation marks and citation omitted); *see Kasper v. Cnty. Of Bucks*, 514 Fed. App'x 210, 214 (3d Cir. 2013); *see also Knox v. Union Twp. Bd. of Educ.*, No. 13-5874, 2015 U.S. Dist. LEXIS 21536, at *33-34 (D.N.J. Feb. 23, 2015).

Here, the Court's reasoning with respect to Plaintiff's failure to show that she was either disparately treated or retaliated against by Defendants is equally applicable to Plaintiff's Equal Protection claim. Indeed, she has failed to demonstrate that she was subjected to different treatment from the treatment that was received by other individuals similarly situated. In that connection, Plaintiff concedes that, during the relevant timeframe, three other non-tenured social studies teachers, like Plaintiff, did not have their contracts renewed, all of whom were "Caucasian, non-Arab, non-Muslim and non-Palestinian." Accordingly, Defendants are entitled to an award of summary judgment on Plaintiff's claim under the Fourteenth Amendment.

## IV.  CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED** in its entirety. The Clerk of Court shall close this case.

Dated: April 30, 2019

/s/ Freda L. Wolfson
Freda L. Wolfson
United States District Judge